**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

STEVEN WAYNE BENDER,            )
                                )            Civil Action No. 05-998
              Petitioner,       )
                                )            Chief Judge Donetta W. Ambrose
       v.                       )            Magistrate Judge Lisa Pupo Lenihan
                                )
JAMES WYNDER, *et al.*,         )
                                )
              Respondents.      )


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.      RECOMMENDATION**

It is recommended that the Petition for Writ of Habeas Corpus filed by Steven Wayne

Bender pursuant to the provisions of 28 U.S.C. § 2254 be denied.  Also, it is recommended that a

certificate of appealability be denied.

**II.     REPORT**

The Petitioner, Steven Wayne Bender, is a state prisoner incarcerated at the State

Correctional Institution located in Dallas, Pennsylvania.  Presently before this Court is his

Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  (Doc. 5).

**A.      Relevant Factual and Procedural Background**

On July 13, 2001, a jury empaneled by the Court of Common Pleas of Fayette County

convicted Bender of second-degree murder in the death of his estranged wife's boyfriend, Marvin

Knieriem.  The jury also convicted him of one count each of burglary, terroristic threats, and

aggravated assault, and three counts of recklessly endangering another person.  He was

represented during pre-trial proceedings, at trial, and on direct appeal by Caroline M. Roberto,

1

Esquire.  The Honorable John F. Wagner, Jr., presided over his trial.

At trial, the Commonwealth presented evidence to establish that, at 2:30 a.m on May 13, 2000, Bender climbed through a window in Knieriem's home.  He carried a 12-gauge shotgun and entered the bedroom where Knieriem, Beverly Pletcher (Bender's estranged wife), his (Bender's) two-year-old daughter, and Knieriem's seven-year-old goddaughter were sleeping.  He shot Knieriem in the chest, killing him instantly.

Beverly Pletcher testified that Bender stated to her after he shot Knieriem: "You dumb fuckers left the window open."  (Ex. 4 at 56).[1]  Then, he turned to her and told her that he was going to shoot her.  (Id.)  Pletcher, who was holding their daughter, refused to put the child down and begged Bender not to shoot her.  Bender then stomped his foot on Knieriem's head and shot him a second time.  (Id. at 57).  He told Pletcher: "I told you I was going to kill that mother fucker."  (Id.)  After he fired the second shot, Bender turned the gun on himself and Pletcher urged him not to pull the trigger.  (Id. at 58-59).  At that point, Bender pointed the gun at the victim and shot him for the third time, this time in the head.  (Id. at 59).  He then exited the residence and Pletcher called the police.

The Commonwealth also presented evidence to establish that, in the weeks leading up to the killing, Bender had been harassing Pletcher and Knieriem and had threatened to kill them.  (Id. at 39-51).  Knieriem's teenage son and Pletcher each recounted that on April 26, 2000, Bender stood outside Knieriem's home and waved a shotgun case toward the house.  (Id. at 39, 42-44; Ex. 5 at 54-58, 66).  Pletcher testified that in early May 2000, Bender pulled up along side

---

[1]      All Exhibits cited herein are contained in the state court record, which was submitted in hardcopy to the court.

them in his car, put his hand in the shape of a gun and said, "Bang, bang, bang.  You're a dead mother fucker."  (<u>Id.</u> at 50).  Pletcher also testified that once Bender confronted Knieriem and told him that he "was done, that he was going to get him."  (<u>Id.</u> at 48).

Leslie Jennings, a co-worker of Bender's, testified that Bender had approached him at work in May 2000 and proposed that they "take care of each others problems."  Jennings, like Bender, was experiencing marital and child custody problems,[2] and he testified that Bender said to him, "I'll kill your wife if you kill mine[.]"  (Ex. 7 at 40).  Jennings testified that Bender told him that twenty-five cents (referring to the cost of a bullet), was cheaper than paying child support for the rest of his life.  (<u>Id.</u> at 41).

In his defense, Bender contended that he believed that Knieriem was sexually abusing his daughter and that, therefore, he was justified in killing Knieriem or his mental state necessitated a conviction of manslaughter rather than murder.  He testified that he did not care that Beverly Pletcher was seeing other men, but stated that Knieriem had used their daughter to taunt him.  On one occasion, he stated, Knieriem kissed and licked this daughter's cheek and then gave him "the finger."  (Ex. 8 at 66-68; <u>see</u> <u>also</u> <u>id.</u> at 72-74).

In late April 2000, Bender testified, he was resting on the sofa after work with his daughter.  When she saw that he was awake, she jumped on his torso, straddled him between her legs and began "riding" him as if simulating the act of sexual intercourse.  (<u>Id.</u> at 68-69).  That evening, he went to the Connellsville Police Station to report that he believed his daughter was being sexually abused.  (<u>Id.</u> at 70).  He testified that he specifically mentioned Knieriem as a

---

[2]      Bender and Pletcher's relationship had become so acrimonious that, pursuant to a court order, they had to exchange custody of their daughter at the police station.

possible suspect of the alleged sexual abuse of his daughter (although the Commonwealth presented evidence to dispute that testimony).  (Id.)

Bender further testified that he had physical custody of his daughter on Thursday, May 11, 2000, and had to return her to Pletcher on Friday afternoon, May 12.  (Id. at 99).  During that time, he stated, his daughter's behavior was again very sexual and there was no doubt in his mind that she was being sexual abused by Knieriem.  (Id. at 99-100).  When he went to the police station on May 12 to exchange custody with Pletcher, he demanded to see the Chief of Police to explain his concerns regarding the sexual abuse.  The Chief was not available, so Bender spoke with Officer Haggarty.  Bender testified that Officer Haggarty did not make a report nor did he provide him with any assistance.  (Id. at 101-02).

Bender testified that after he was rebuffed by the police, he could not sleep that night because he regretted giving his daughter to Pletcher.  At that point, he stated, he decided to take his loaded shotgun to the Knieriem home with the sole purpose of preventing his daughter's sexual abuse by removing her from the home.  (Id. at 104).  He further stated that he loaded his shotgun not with the intention to act as the aggressor, but with the intent to defend himself and his daughter during the course of removing her from the Knieriem home.  (Id. at 104-05).

When he arrived at the Knieriem home, he testified, the front door was locked, so he climbed through an open front window.  (Id. at 106-07).  Once in the home, he opened a bedroom door and saw Pletcher and Knieriem asleep together in bed with his daughter laying between them.  (Id. at 107).  Bender stated that Knieriem was holding Bender's daughter's hand on his penis.  (Id.)  He testified that Knieriem "awoke and . . . he knew that I caught him." (Id.)  Bender testified that Knieriem lunged at him and so he fatally shot Knieriem in the chest.  (Id. at

4

107-09).        Prior to the commencement of closing arguments, the trial court conducted a

charging conference.  At that time, Attorney Roberto requested that the court provide the jury

with the following "justification" instructions: (1) Use of Force in Self Protection (see

Pennsylvania Suggested Standard Criminal Jury Instructions ("PSSCJI" § 9.505); (2) Use of

Force for the Protection of Other Persons (in this case, Bender's daughter) (see PSSCJI § 9.506);

and (3) Use of Force to Prevent the Commission of a Crime (in this case, the sexual abuse of

Bender's daughter) (see PSSCJI § 5.08).  Judge Wagner agreed to give the standard self-defense

instruction, but rejected the request with regard to the other justification instructions.  (7/13/2001

Trial Tr. at 5-15 (attached to Ex. 4)).  The court did instruct the jury regarding voluntary

manslaughter.

        After the jury convicted Bender, Attorney Roberto filed a direct appeal on his behalf to

the Superior Court of Pennsylvania.  (See Ex. 11).  On December 31, 2002, the Superior Court

affirmed Bender's judgment of sentence.  (Ex. 12).  Bender then filed a post-conviction

proceeding pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA"), in which he

raised approximately 10 issues of ineffective assistance of counsel.  Judge Wagner appointed

counsel to represent Bender, but Bender informed the court that he wanted to represent himself.

The court conducted a PCRA hearing on October 28, 2003 and March 12, 2004 (at which

Attorney Roberto testified).  Bender thereafter filed a separate motion seeking an additional

hearing to further develop his argument concerning an alleged conspiracy between the District

Attorney, the Connellsville Police Department, and Attorney Roberto to cover up issues relating

to the alleged sexual molestation of his daughter.   That motion was denied, and, on June 16,

2004, Judge Wagner issued a decision denying PCRA relief.  (Ex. 30, App. A).   Bender

appealed to the Superior Court of Pennsylvania.  (Exs. 27-30). On April 29, 2005, the Superior

Court issued a decision in which it affirmed Judge Wagner's denial of PCRA relief.  (Ex. 32).

Bender then filed with this court his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

§ 2254 (Doc. 5)  and a 143 page Memorandum of Law (Doc. 6 and hereinafter cited to as

"Memo. at __ ), in which he makes numerous constitutional challenges to his convictions and

argues that he is entitled to federal habeas corpus relief.

**B.**     **Legal Analysis**

    **(1)**     **Standard of Review**

    The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No.

104-132 § 104, 110 Stat. 1214, restricts a federal court's authority to grant relief when a state

court has previously adjudicated and rejected the petitioner's federal constitutional claims. 28

U.S.C. § 2254(d). It provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Price v. Vincent,

538 U.S. 634, 641 (2003); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).

**(2)**     **Trial Court Error**

At the close of evidence at Bender's trial, Attorney Roberto requested that the jury be instructed regarding what is commonly referred to as the "justification defenses."  As explained above, in addition to requesting the self-defense instruction (which was granted), Attorney Roberto also requested that the jury be provided with the standard jury instruction regarding "use of force for the protection of other persons."  This instruction explains that under Pennsylvania law, the use of deadly force is justifiable to protect another person (in this case, Bender's daughter) if the slayer reasonably believes such force is *immediately necessary* to protect the other person against *death, serious bodily injury, kidnaping or sexual intercourse compelled by force or threat*. (See Ex. 11, App. A at 9).  Additionally, the defense requested that the jury be instructed regarding "use of force to prevent the commission of a crime."  This instruction explains that the law recognizes that the use of deadly force is justifiable if the slayer reasonably believes that there was a substantial risk that the person committing the crime (allegedly Knieriem) will cause death or serious bodily injury to another (in this case, Bender's daughter) unless the commission of the crime was prevented.  (Id.)

Judge Wagner denied Attorney Roberto's request that the two justification defense instructions at issue be given, and Bender contends that that decision violated his federal constitutional rights.[3]  On direct appeal, Attorney Roberto contended that Judge Wagner's decision violated Bender's right to due process of law as guaranteed by the Fourteenth Amendment (in addition to violating state law), which entitles a defendant to instructions concerning any defense for which there exists evidence sufficient to allow a reasonable jury to

---

[3]     This claim is raised as Claim 2 in Bender's habeas petition.

find in his or her favor.  (Ex. 11 at 52).  The Superior Court of Pennsylvania rejected the claim

on the merits.  (Ex. 12 at 16-17).  It held that Judge Wagner properly determined that, based

upon the evidence presented at trial, there was no possible basis that the jury could find that

Bender's young daughter was in immediate threat of death, sexual intercourse compelled by

force, or serious bodily injury;  therefore the instructions were not appropriate.  (Id.)

Accordingly, the only issue that this Court must resolve is whether the state courts' decision

regarding the claim was "contrary to" or an "unreasonable application of" "clearly established

Federal law," or "resulted in a decision that was contrary to, or involved an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding."  28

U.S.C. § 2254(d).

     At the outset, we note that "it is not the province of a federal habeas court to reexamine

state-court determinations of state-law questions.  In conducting habeas review, a federal court is

limited to deciding whether a conviction violated the Constitution, laws or treaties of the United

States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Where an error in the jury instructions

is alleged, it must be established not merely that the instructions, or, in this case, the refusal to

give an instruction, was erroneous under state law, but that the trial court's decision regarding the

instruction "so infected the entire trial that the resulting conviction violated due process."  Cupp

v. Naughten, 414 U.S. 141, 147 (1973); see also Estelle, 502 U.S. at 72.

     Thus, in order to prevail on his federal constitutional claim, Bender must first establish

that the state courts erred, and that that error was of constitutional magnitude.  Id.; cf. Johnson v.

Rosemeyer, 117 F.3d 104, 109-115 (3d Cir. 1997); Davis v. Strack, 270 F.3d 111, 123-24 (2d

Cir. 2001).  This he has failed to do.  Here, as Judge Wagner noted in denying the request for

these instructions, Bender's daughter was not in imminent danger of death, great bodily harm, or

a felony, because the child, Knieriem, and Pletcher were sleeping at the time Bender broke into

the home and entered their bedroom.  When Bender awoke them, Beverly Pletcher grabbed the

child; thus, even if Knieriem did lunge at Bender, Bender was not justified in using deadly force

to protect his daughter from Knieriem, because her person was not in immediate danger.  As

Judge Wagner noted:  "It is the 'imminent' element that the [Bender] refuses to grasp or

acknowledge. [He], mistakenly, is convinced that a prior act or an anticipated future act would

provide justification.  This is simply not the law. [Bender] was not required on the date of this

incident to use force to defend himself or any other person from death or great bodily harm or

felony."  (Ex. 32, App. A at 14-15).

Because there was no evidence presented at trial that Bender's daughter was in imminent

danger of death, serious bodily harm, or sexual intercourse by force, neither state law nor federal

law required the justification instructions at issue be given.  Accordingly, the state courts'

decision denying relief on this claim was not "contrary to" nor an "unreasonable application of"

"clearly established Federal law," nor did it result "in a decision that was contrary to, or involved

an unreasonable determination of the facts in light of the evidence presented" at trial. 28 U.S.C.

§ 2254(d).

#### (3)     Ineffective Assistance of Trial Counsel

Bender next argues that Attorney Roberto provided him with ineffective assistance at

trial and on direct review.  In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court

of the United States held that in order to establish that counsel's service was constitutionally

deficient, a petitioner must demonstrate: (1) that counsel's performance was unreasonable;[4] and

(2) that the deficient performance prejudiced the defense.[5] See also Wiggins v. Smith, 539 U.S.

510, 521 (2003) and Williams, 529 U.S. at 390-91.

### (a)   Selection of the Jury

Bender claims that Attorney Roberto provided him with ineffective assistance during the

jury selection proceedings because she deprived him "of a fair, competent, unbiased,

unprejudiced, impartial, untainted, uncorrupted, and unpolluted jury[,]" and selected a jury that

was "organized to convict[.]"[6] (Memo. at 33).  Specifically, he claims jurors numbered 101, 115,

156, 232, and 137 each indicated during voir dire that he/she had been a victim of a crime in the

past and that Attorney Roberto should have objected to his/her inclusion in the jury because

he/she would be biased against the defense.

In rejecting this claim, the Superior Court held that Attorney Roberto articulated a

reasonably strategic reason for not objecting to the inclusion of a juror that had been the victim

of a crime. (Ex. 32 at 14-15).  At the PCRA hearing, she testified that her vast experience as a

---

[4]    To satisfy the first requirement of Strickland, the petitioner must establish that his
attorney's representation fell below an objective standard of reasonableness by committing errors
so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth
Amendment. Strickland, 466 U.S. at 688. A court must indulge a strong presumption that
counsel's conduct falls within the wide range of reasonable professional assistance; that is, the
petitioner must overcome the presumption that, under the totality of the circumstances, the
challenged action "might be considered sound trial strategy." Id. at 689, 690-92. The question is
not whether the defense was free from errors of judgment, but whether counsel exercised the
customary skill and knowledge that normally prevailed at the relevant time and place. Id. at 689.

[5]    To prove prejudice, a petitioner "must show that there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding would have been different. A
reasonable probability is a probability sufficient to undermine confidence in the outcome."
Strickland, 466 U.S. at 694.

[6]    This claim is raised as Claim 1 in Bender's habeas petition.

criminal defense attorney has taught her not to automatically object to such individuals because, in many cases, they may have been dissatisfied with some aspect of the police's conduct and as a result are more amenable to the defense's interests.  (Ex. 16 at 59).  She felt that reasoning was particularly pertinent in Bender's case because part of his defense was that the police failed to perform a proper investigation.  Instead of automatically objecting to jurors that have been victimized, Attorney Roberto explained, she carefully reviews juror questionnaires and discusses the potential jurors with her client to determine whether the defense should move to challenge a potential juror.  (Id. at 57-59).  She followed those procedures in Bender's case and used challenges for cause or made a peremptory challenge when the circumstances warranted.  (Id.)

Bender has failed to demonstrate that the Superior Court's adjudication of this ineffective assistance of claim was "contrary to" Strickland.  Although the Superior Court did not cite Strickland in denying his claims, it did rely on Pennsylvania cases that set out an identical standard for ineffectiveness. (Ex. 32 at 6 (citing Commonwealth v. Holloway, 739 A.2d 1039, 1044 (Pa. 1999)); see also Werts v. Vaughn, 228 F.3d 178, 202-03 (3d Cir. 2000) (examining Pennsylvania ineffective assistance law and determining that it is identical to the Strickland standard).  As the Williams Court explained, "a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  Williams, 529 U.S. at 406.

Bender likewise has failed to demonstrate that the Superior Court's decision was an "unreasonable application" of Strickland, or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented[.]" 28 U.S.C.§ 2254(d). Considering Attorney Roberto's PCRA testimony and the strong deference that

the court must afford trial counsel's strategic decisions, the Superior Court's denial of this claim easily satisfies AEDPA's standard of review.

### (b)   Failure to Argue that Bender Was Not Competent to Stand Trial

In his next claim for relief, Bender argues that Attorney Roberto provided him with ineffective assistance of counsel because she did not request a competency hearing.[7]  In support of this claim, he attaches to his Memorandum of Law the psychological examination report prepared by Dr. Herbert I. Levit, P.C., a clinical and forensic psychologist that examined Bender on May 2, 2001 at the behest of Attorney Roberto.  He argues that Dr. Levit's report, his (Bender's) conduct prior to his trial (including a suicide attempt), and his allegations of sexual abuse and police misconduct, should have alerted his counsel that he was not competent to stand trial.  (Memo. at 58-66).

Bender did not properly raise this claim during the PCRA proceedings; therefore, he failed to exhaust his state-court remedies and the claim is procedurally defaulted.[8]  He contends

---

[7]      This claim is raised as Claim 3 in Bender's habeas petition.

[8]      The federal habeas statute "requires that prisoners exhaust their claims in state court before seeking relief in federal courts."  Slutzker v. Johnson, 393 F.3d 373, 379 (3d Cir. 2004) (citing 28 U.S.C. § 2254(b)(1)(A)).  Generally, a district court should require that a state prisoner return to state court for review of unexhausted claims.  See Crews v. Horn, 360 F.3d 146 (3d Cir. 2004).  However, a federal court may excuse a petitioner's failure to exhaust in cases where the federal court can confidently predict that the state courts would not entertain review of the claims because such review would be barred by a state procedural rule, such as a statute of limitations.  Slutzker, 393 F.3d at 380; Whitney v. Horn, 280 F.3d 240, 249-53 (3d Cir. 2002); Lines v. Larkins, 208 F.3d 153, 162-66 (3d Cir. 2000).  That is the case here, as any PCRA petition that Bender might now attempt to file would be untimely and unreviewable in the Pennsylvania courts.  See 42 PA.CONS.STAT. § 9545(b)(1).  Under such circumstances, exhaustion is considered "futile."  Slutzker, 393 F.3d at 380; Whitney, 280 F.3d at 250; Lines, 208 F.3d at 162.  Importantly, when a petitioner cannot exhaust his claims due to futility, those claims are considered "procedurally defaulted" in federal habeas court.  Id. at 380; Whitney, 280 F.3d at 252; Lines, 208 F.3d at 166.  The procedural default doctrine applies to bar federal

that he raised the claim on page 69 of his brief to the Superior Court of Pennsylvania (Ex. 30 at 69), but his passing reference to his belief that he was not competent to stand trial was not sufficient to alert the state court that he was claiming that his counsel provided him with ineffective assistance for not challenging his competence.  Moreover, neither Judge Wagner nor the Superior Court of Pennsylvania addressed this purported claim, further supporting this court's finding that Bender did not properly present it to the state courts.

Nevertheless, even if this claim was not procedurally defaulted and this court could review it *de novo*, Bender still would not be entitled to federal habeas corpus relief.  Under Pennsylvania law, competency to stand trial is measured according to a defendant's ability to understand the nature and object of the criminal proceedings and to participate and assist in his defense.  See e.g., Commonwealth v. Appel, 689 A.2d 891, 899 (Pa. 1997) (citing 50 PA.STAT. § 7402(a), and indicating that "[s]tated otherwise, the relevant question is whether the defendant has sufficient ability at the pertinent time to consult with counsel 'with a reasonable degree of rational understanding,' and have a 'rational as well as a factual understanding of the proceedings.'" (citation omitted)).  Nothing in Dr. Levit's report indicates that Bender could not understand the nature and object of the criminal proceedings or participate and assist Attorney Roberto in his defense, and nowhere in the report does Dr. Levit question his competency to stand trial.

Moreover, during the PCRA hearing, Attorney Roberto articulated an objectively

---

habeas review when a state court has declined or would decline "to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."  Id. at 380-81 & 381 n.6 (internal quotation and citation omitted).  "The *raison d'être* for the doctrine lies in the fact that a state judgment based on procedural default rests on independent and adequate state grounds."  Id. at 381 (citations omitted).

reasonable basis for not raising an issue regarding Bender's competency.  First, she stated that

nothing that she had observed during her many meetings with Bender indicated to her that his

competency was at issue.  (Ex. 16 at 33).  Second, she and defense investigators conducted a

thorough investigation into Bender's background, and she explained that she had a psychologist,

Dr. John Wilson, in addition to Dr. Levit, examine Bender to see if he was suffering from

posttraumatic stress disorder as a result of his military service in the Gulf War, or if, in their

expert medical opinion, Bender could present an insanity or a diminished capacity defense.

Although neither doctor was instructed to examine Bender for competency (because Attorney

Roberto observed no issue with regard to competency), nothing in her discussions with either

doctor indicated to her that competency to stand trial was an issue that needed to be further

explored.  (Id. at 29-35).

(c)      **Failure to Raise the Alleged Violation of Bender's <u>Miranda</u> Rights<br>and Violations of Bender's Right to Remain Silent**

In his next claim, Bender argues that Attorney Roberto provided him with ineffective

assistance of counsel because she failed to challenge violations of his federal constitutional

rights that allegedly occurred when the trial court allowed statements he made to Detective

Thomas Cesario on May 31, 2000–approximately 18 days after his arrest and after he had

obtained counsel–to be admitted at trial.[9]  On that date, Det. Cesario testified, he was

fingerprinting Bender when they began to engage in what he characterized as "small talk" about

---

[9]     This claim is raised at Claim 4 and Claim 5 of Bender's habeas petition.  He contends that Attorney Roberto failed to allege that the Commonwealth violated his Fifth and Fourteenth Amendment right to remain silent by referencing Bender's discussion with Det. Cesario during trial questioning and during closing arguments (Memo. at 87, 88) and his Fifth, Sixth, and Fourteenth Amendment rights by interrogating him outside the presence of his counsel.  (Memo. at 68-75).

14

a new prison facility.  (Ex. 7 at 68-78).  During the course of that discussion, Bender told Det.

Cesario that he wanted a trial.  (Id. at 70).  He told Det. Cesario, "I can't wait.  I want people to

know why.  They can give me the needle tomorrow.  Nobody does this to my family."  (Id.)

Bender then stated, "Tell me you wouldn't do the same if it was your family?  You know you

would.  Don't tell me any different."  (Id.)

 The state courts rejected this claim on the merits during the PCRA proceedings.  (See Ex.

30, App. A at 7-9; Ex. 32 at 12-13).  The courts' decision was not "contrary to" nor and

"unreasonable application of" Strickland.  Bender's contention that Attorney Roberto failed to

properly pursue the alleged federal constitutional claims at issue is without merit.  As the state

courts noted, contrary to Bender's contention, the record reveals that Attorney Roberto argued

zealously to suppress the statements that Det. Cesario characterized as "small talk" at the

omnibus pretrial hearing held on January 2, 2001 before the Honorable Judge Ralph C. Warman,

and at trial.  (See Ex. 2  at 97-100; Ex. 7 at 68-78).

 Judge Warman denied the defense's motion to suppress Bender's statements to Det.

Cesario.  The court held that the statements to Det. Cesario centered on the new prison facility,

and that the conversation was not reasonably likely to elicit an incriminating response.

Additionally, the court held that the statements were not the product of police interrogation, but

were unsolicited gratuitous utterances that were admissible.

 At trial, Attorney Roberto presented a motion in limine regarding the admissibility of

Bender's statements to Det. Cesario.  (Ex. 7 at 55).  She specifically objected to statements

characterized as "small talk" that were made during the time Bender was being fingerprinted.

(Id. at 55-57).  The trial court noted the exception, and allowed Det. Cesario to testify as to the

statements concerning the new prison facility.  (Id. at 57, 80).  And, when the prosecution asked

Det. Cesario if Bender, between May 13th and May 31st, made any allegations concerning child

abuse to him, Attorney Roberto objected on the grounds that Bender had no duty to speak to the

police about anything.  (Id. at 69).

Upon review of Attorney Roberto's objections, both at the pre-trial hearing and again at

trial, to the admissibility of the statements made to Det. Cesario as "small talk," this court, like

the state courts, finds Bender's contention that his counsel provided him with ineffective

assistance of counsel in this regard to be utterly meritless.[10]

> **(d)     Failure to Vigorously Defend Bender on Theory of Defense of Others, Conspiring With the Prosecution to Suppress Evidence, and Failing to Object to the Presentation of False Evidence**

Bender contends that Attorney Roberto provided him with ineffective assistance of

counsel for failing to vigorously defend him on a theory of defense of others.  In the course of

briefing this claim, he makes outrageous and unsupportable accusations that Attorney Roberto,

the District Attorney of Fayette, the Connellsville Police, and numerous other elected officials

---

[10]     The court notes that, although Attorney Roberto apparently did challenge the suppression court's decision on direct appeal (see Ex. 11, App. A), she abandoned the claim by the time she filed the Brief of Appellant with the Superior Court.  (See Ex. 11).  To the extent that Bender is arguing that Attorney Roberto provided him with ineffective assistance for failing to challenge the suppression court's ruling on direct appeal, that claim too is denied.  Bender had ample opportunity to question Attorney Roberto at the PCRA hearing and did not ask her why she abandoned the claim in the brief to the Superior Court.  Appellate counsel may have numerous legitimate reasons for failing to pursue a claim on direct appeal.  Perhaps Attorney Roberto felt the claim had no merit, that if there was an error it had not prejudiced the defense, or that the inclusion of the claim would detract from what she felt were more meritorious issues.  Bender has failed to establish that Attorney Roberto provided him with constitutionally deficient representation for failing to pursue this claim on direct appeal.  See e.g., Sistrunk v. Vaughan, 96 F.3d 666, 671 (3d Cir. 1996) (it is the petitioner who has the burden to prove all facts in support of his claim under Strickland.)

conspired together to cover-up evidence of alleged sexual molestation of his daughter.  He contends that the alleged conspirators concealed evidence of a condom, a tub of K-Y Jelly, and a video camera, and that the alleged conspirators denied him blood and/or DNA evidence from the crime scene.[11]

The Superior Court rejected this claim on the merits.  Its thorough consideration and rejection of this claim is worth repeating here:

> First, appellant argues that his trial counsel conspired with the Commonwealth to conceal evidence of the alleged sexual abuse of his daughter at the hands of [the] decedent, thereby hampering the defense of others.  We disagree.
>
> At appellant's PCRA hearing, trial counsel testified that she worked vigorously to uncover corroborating evidence of appellant's claimed cover-up conspiracy.  Trial counsel testified that she considered all the evidence, including photographs of the crime scene, in attempts to substantiate [appellant's] allegations [of sexual abuse.] Counsel also employed a private investigator to investigate appellant's contentions, to no avail.  Additionally, while there was no evidence of a condom at the crime scene, counsel still argued at trial that inappropriate sexual conduct should nevertheless be inferred based on the tube of K-Y Jelly that was found in the bedroom.[12] [Ex. 16 at 11-12]
>
> Most importantly, however, were the hospital records of appellant's daughter.  These records showed no signs of sexual abuse (appellant's daughter's hymen was intact, she exhibited no scarring or abrasions, and there was an absence of any other evidence consistent with sexual abuse.)  [Id. at 16-17].  The trial court determined that appellant's claim lacked any factual basis in the record, but that trial counsel nevertheless inquired into the allegations of conspiracy with reasonable diligence.  The trial court determined that appellant failed to show merit to his underlying claim and that trial counsel had a reasonable basis for her

---

[11]    This claim is raised as Claim 6 in Bender's habeas petition.

[12]    With regard to the videotape that Bender alleges the prosecution suppressed, Judge Wagner noted: "Attorney Roberto testified that in preparation for the trial, she looked at the original photographs and all evidence collected to find evidence of a videotape recording but could not find any.  She also employed a private investigator to attempt to discover the same." (Ex. 32, App. A at 10).

conduct. . . .
- - - -

[Trial] counsel investigated all of appellant's claims and possible defenses. Counsel testified that, while decedent's home was considered to be in a state of squalor, counsel did not believe that the condition of the home constituted a reasonable basis upon which to base appellant's belief that his daughter was being sexually abused. [Id. at 13-14]. Counsel testified that she felt that advancing such unsustainable arguments would be detrimental to appellant's case. Id. . . .

Appellant next claims that trial counsel was ineffective by failing to investigate and call witnesses to support his defense of others theory. Appellant wished to call a nurse practitioner who was involved with the examination of appellant's daughter at the hospital. Also, appellant desired to call a number of his family members and co-workers as character witnesses. Appellant claims that these witnesses would have helped his case. We disagree.
- - - -

Here, trial counsel decided not to call the hospital nurse because her testimony (that appellant's daughter showed no signs of sexual abuse) would have been detrimental to appellant's strategy. With regard to appellant's proposed character witnesses, including family members and previous co-workers, trial counsel presented witnesses from appellant's place of employment. Counsel decided not to call the other witnesses due to the possibility of damaging impeachment of them by the Commonwealth (appellant had asked these witnesses to perpetrate violence on decedent in the past.) [Id. at 17, 45, 81]. The court determined that the proposed witnesses' testimony would have been unavailing in support of appellant's defense theory and that trial counsel provided a reasonable basis for examining only those witness whom she believed would best facilitate trial strategy.

(Ex. 32 at 7-11).

This court need not expand upon the Superior Court's analysis of this claim. Attorney Roberto exerted considerable effort to find corroborating evidence to substantiate Bender's claims of an alleged cover-up of the sexual abuse of his daughter. She could find nothing to support his allegations and she testified that she crafted the best defense she could for her client under the circumstances. Bender's contentions regarding the alleged conspiracy between Attorney Roberto, the District Attorney's Office, the Connellsville Police Department, and local elected officials is misguided and devoid of any support in the record. The state court's decision

denying this claim was not "contrary to" or an "unreasonable application of" Strickland, nor did it result "in a decision that was contrary to, or involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding,"  28 U.S.C. § 2254(d).

### (4)  Failure to Conduct Additional PCRA Evidentiary Hearings

In his final claim, Bender contends that his due process rights were violated because Judge Wagner denied his request for a second evidentiary hearing so that his family could testify in support of allegations.  This claim is not cognizable in federal habeas corpus review.  The issue of whether a PCRA petitioner is entitled to an evidentiary hearing is a question of state law that is not subject to review by a federal court.  Preister v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004).  Moreover, even if the state court erred as a matter of state law in not granting an evidentiary hearing, Bender would not be entitled to habeas corpus relief because errors in the course of a state's post conviction process simply are not cognizable in a federal habeas petition. Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("The federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation. . . . Federal habeas power is 'limited ... to a determination of whether there has been an improper detention by virtue of the state court judgment.'"); Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to [federal] habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotation marks omitted); Roe v. Baker, 316 F.3d 557, 571 (6th Cir. 2002) ("relief may not be granted to a habeas petitioner for alleged deficiencies in a state's post-

conviction procedure").

**(5)**      **Additional Claims**

Bender faults the state courts for failing to address the underlying constitutional claims that provide the basis for his ineffective assistance of counsel claims.  Under Pennsylvania law, however, he (through Attorney Roberto) had the opportunity to raise those claims on direct appeal, yet did not raise them until his pro se PCRA petition.  Accordingly, the underlying claims were waived under Pennsylvania law.  42 Pa.Cons.Stat. 9544(b) (stating claims not presented at trial or on earlier appeal are waived and therefore, not grounds for PCRA relief).  As a result, to be eligible for PCRA relief, Bender had to contend that Attorney Roberto provided him with ineffective assistance for failing to raise the underlying claims of constitutional error. See Pa. Cons.Stat. §§ 9543(a)(3), 9544(b).  Accordingly, the state courts properly interpreted his contentions as raising  Sixth and Fourteenth Amendment claims that he received constitutionally ineffective counsel at trial and on direct appeal.  The ineffective assistance of counsel claims are the claims that were exhausted before the state courts, and those are the claims that this court may address in the instant petition.  To the extent that Bender is attempting to raise the purported constitutional violations that provide the basis for his ineffective assistance of counsel claims as independent claims that entitle him to federal habeas relief, those independent claims of constitutional error were not exhausted and are therefore procedurally defaulted.  See supra note 8.

**(6)**      **Certificate of Appealability**

Section 102 of AEDPA, 28 U.S.C. § 2253(C) (as amended), codifies standards governing

the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. Amended Section 2253 provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." Because Bender has not made such a showing, a certificate of appealability should be denied.

**III.   <u>CONCLUSION</u>**

It is recommended that, pursuant to 28 U.S.C. § 2244(b) and Rule 9 of the Rules Governing Habeas Corpus Cases Under Section 2254, that the Petition for Writ of Habeas Corpus be denied.  In accordance with the Magistrates Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

<u>/s/Lisa Pupo Lenihan</u>
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: June 5, 2006.

cc:   The Honorable Donetta W. Ambrose

      All Parties of Record

21